UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDSAY MCLAUGHLIN,

      Plaintiff,                                Case No. 19-cv-10271
                                                Hon. Matthew F. Leitman

v.

CITY OF AUBURN HILLS,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 19)

Plaintiff Lindsay McLaughlin alleges that her employer, Defendant City of Auburn Hills ("Auburn Hills" or "the City"), unlawfully terminated her on the basis of her gender, weight, and disabilities, and because she exercised her right to receive worker's compensation benefits. (*See* Compl., ECF No. 1-1.)  McLaughlin also alleges that Auburn Hills failed to provide her with reasonable accommodations for her disabilities. (*See id.*)  Auburn Hills has moved for summary judgment on all of McLaughlin's claims. (*See* Mot. for Summ. J., ECF No. 19.)  For the reasons explained below, Auburn Hills' motion is **GRANTED IN PART** and **DENIED IN PART**.

1

**I**

**A**

On January 7, 2013, McLaughlin was hired by the City of Auburn Hills as an Election Clerk. (*See* Dep. of Former City Clerk Terri Kowal at 6:4–9, ECF No. 19-11, PageID.257.)   In that position, she was supervised by the City Clerk. (*See* McLaughlin Dep. at 28:16–18, ECF No. 20-1, PageID.449.)  Terri Kowal was the City Clerk at the time McLaughlin was hired, and Kowal served in that position until she retired on December 15, 2017. (*See id.* at 28:19–21; Kowal Dep. at 5:3–6, ECF No. 19-11, PageID.257.)   Laura Pierce then replaced Kowal as City Clerk. (*See* McLaughlin Dep. at 28:24–29–4, ECF No. 20-1, PageID.449.)  Pierce supervised McLaughlin for the remainder of McLaughlin's employment with the City. (*See id.* at 29:5–6.)

McLaughlin's employment with Auburn Hills was subject to a collective bargaining agreement (the "CBA"). (*See* Conditional Offer of Employment, ECF No. 19-6, PageID.223; CBA, ECF No. 19-19.)   Three provisions of the CBA are relevant to McLaughlin's claims in this action.  First, under Article 15, Section 2(b) of the CBA, an application for medical leave must be in writing and "accompanied by proper medical documentation." (CBA Art. 15, § 2(b), ECF No. 19-19, PageID.305.)  Second, Article 15, Section 2(h) of the CBA states that Auburn Hills

may terminate an employee if the employee fails to return to work at the conclusion of the employee's medical leave:

> An employee who fails to return to work upon the termination of a leave of absence without properly notifying the Employer, shall lose seniority, and employment may be terminated in accordance with Article 9, Section 3, C.

(*Id.* Art. 15, § 2(h), PageID.306.)  Third, Article 9, Section 3(c) of the CBA provides that an employee may be terminated if the employee is absent for three consecutive working days without notifying the City:

> An employee shall lose his/her seniority [if] [h]e/she is absent for three (3) consecutive working days without notifying the Employer.  In the event the employee is incapable or unable to advise the Employer for reasons or causes beyond the control of the employee, an exception shall be made, provided the employee has accepted written reasons.  After such absence, the Employer will send written notification to the employee at his last-known address that he/she has lost his/her seniority, and his/her employment will be terminated.  If the disposition made of any such case is not satisfactory, the matter may be referred to the grievance procedure.

(*Id.*, Art. 9, § 3(c), PageID.300.)

## B

McLaughlin suffered two work-related injuries to her back while she was employed by Auburn Hills.  McLaughlin says that Auburn Hills did not provide her with all of the reasonable accommodations that she requested when she returned to work after her injuries.

3

McLaughlin's first work-related injury occurred on March 25, 2015, when she slipped and fell on an icy walkway. (*See* 3/25/15 Accident Report, ECF No. 20-7, PageID.569.)  McLaughlin landed on her back and bottom, causing her "[l]ower back pain with shooting pains down [her] legs." (*Id.*)

Following her slip and fall, McLaughlin took sick leave and then leave pursuant to the Family and Medical Leave Act ("FMLA"). (*See* McLaughlin Timeline, ECF No. 19-7, PageID.225.)  McLaughlin returned to work part-time on July 14, 2015. (*See id.*)  On July 23, 2015, Dr. Bradley Ahlgren – McLaughlin's orthopedic surgeon – took McLaughlin off work again in order to prepare her for a decompressive lumbar laminectomy/discectomy on her L4–L5 spinal segment. (*See* 7/23/15 Ahlgren Letter, ECF No. 20-8, PageID.572.)  The same day that Dr. Ahlgren took McLaughlin off work, McLaughlin formally requested a medical leave from the City. (*See* 7/23/15 Request for Leave, ECF No. 20-9, PageID.574.) McLaughlin's request for leave was granted. (*See* McLaughlin Timeline, ECF No. 19-7, PageID.225.)  McLaughlin received worker's compensation benefits while she was off work. (*See id.*; McLaughlin Dep. at 123:3–9, ECF No. 20-1, PageID.468.)

On October 19, 2015, McLaughlin returned to work part-time. (*See* McLaughlin Timeline, ECF No. 19-7, PageID.225.)  Dr. Ahlgren imposed the following restrictions on McLaughlin's work: "[n]o lifting greater than 10 pounds," "part time (4 hours) 10.19.15–11.9.15," "no repetitive twisting/lifting," "rest as

needed," and "ability to reposition as needed." (10/19/15 Ahlgren Letter, ECF No. 20-10, PageID.576.) On November 9, 2015, McLaughlin returned to work full-time. (*See* McLaughlin Timeline, ECF No. 19-7, PageID.225.) Despite Dr. Ahlgren's imposed 10-pound lifting limit, Auburn Hills "still required [McLaughlin] to deal with all the heavy ballot boxes [and] move heavy equipment" in excess of the 10-pound limit. (McLaughlin Dep. at 117:1–10, ECF No. 20-1, PageID.466.)

McLaughlin's second work-related injury occurred on January 25, 2016, when she re-injured her back "while bending down for a binder after moving heavy ballot boxes and voting machines." (Resp., ECF No. 20, PageID.420; *see also* McLaughlin Timeline, ECF No. 19-7, PageID.225.) McLaughlin's injury was so severe that the fire department had to remove her on a stretcher. (*See* Dep. of Auburn Hills HR Generalist Jane Parpart at 64:8–18, ECF No. 20-4, PageID.527.) McLaughlin was taken to William Beaumont Hospital, where she was diagnosed with, among other things, acute lumbar radiculopathy. (*See* Beaumont Discharge, ECF No. 20-12, PageID.580.)

On March 26, 2016, McLaughlin went off work for a second laminectomy and discectomy at Beaumont Hospital. (*See* Resp., ECF No. 20, PageID.420; citing McLaughlin Dep. at 117:11–13, ECF No. 20-1, PageID.466; *see also* 4/12/16 Beaumont Letter, ECF No. 20-13, PageID.582.) McLaughlin returned to work part-time on October 4, 2016, and she returned to work full-time on July 31, 2017. (*See*

McLaughlin Timeline, ECF No. 19-7, PageID.225.)  McLaughlin received worker's compensation benefits while she was off work. (*See* McLaughlin Dep. at 127:20–128:2, ECF No. 20-1, PageID.46.)

When McLaughlin returned to work full-time in July 2017, Dr. Ahlgren imposed the following "permanent restrictions" on McLaughlin's work: "no lifting > 10 [pounds]" and "allow breaks as needed." (7/31/17 Ahlgren Letter, ECF No. 19-12, PageID.264.)   But when McLaughlin returned to work, she was still "required . . . [to] deal with heavier items and continue to deal with all the equipment, which included bending, lifting and twisting" and to "move [and lift] ballot boxes that weighed more than 10 pounds." (McLaughlin Dep. at 117:22–118:25, ECF No. 20-1, PageID.466–467.)  Although Auburn Hills' insurance agency provided McLaughlin with a cart so that she could move boxes that weighed more than 10 pounds without carrying them by hand, McLaughlin still had to "lift the boxes to the cart." (*Id.* at 119:9–11, PageID.467.)

Auburn Hills had questions and concerns about the restrictions Dr. Ahlgren imposed on McLaughlin's work.  Assistant City Manager Donald Grice and Human Resources Generalist Jane Parpart met with McLaughlin and two union representatives to discuss how McLaughlin could perform her work as an Election Clerk while also adhering to Dr. Ahlgren's 10-pound lifting limit. (*See id.* at 111:14–23, PageID.465.)   During the meeting, McLaughlin was informed that the City

6

would conduct an independent medical examination (an "IME") of McLaughlin and "that they would go off of the IME and not the restrictions that [she] was given by [Dr. Ahlgren]." (*Id.* at 111:23–112:1.)  According to Grice, an Election Clerk with a 10-pound weight restriction "wouldn't meet the job requirements" because "there was . . . a 25 pound weight requirement for the job." (Grice Dep. at 22:17–22, ECF No. 19-10, PageID.250; *see also* Elections Clerk Position Description, ECF No. 19-33, PageID.377 ("The employee must occasionally lift and/or move up to 25 pounds.").)

Dr. Todd Francis conducted the IME on August 29, 2017. (*See* Resp., ECF No. 20, PageID.422.)   According to Dr. Francis' evaluation, McLaughlin was capable of lifting up to 25 pounds. (*See* McLaughlin Dep. at 168:11–12, ECF No. 20-1, PageID.474.)  Following the IME, Grice informed McLaughlin that the City would not adhere to Dr. Ahlgren's 10-pound lifting limit.[1] (*See id.* at 115:11–23, PageID.466.)

## C

Throughout her employment as an Election Clerk, McLaughlin was subject to verbal abuse regarding her gender, weight, disability, and receipt of worker's

---

[1] After the IME, Auburn Hills and its worker's compensation provider disputed McLaughlin's need for ongoing worker's compensation benefits. (*See* Notice of Dispute, ECF No. 20-16, PageID.643.)

compensation benefits.   The principal source of this abuse was McLaughlin's supervisor, Kowal.

According to McLaughlin, Kowal made several inappropriate comments related to McLaughlin's gender.  Kowal made "[c]onstant comments regarding [how her] eggs [were] going to dry up and [she] will never have children." (*Id.* at 67:18–19, PageID.456.)  Kowal told McLaughlin "multiple times that due to [her] pizza face [referring to McLaughlin's acne flaring up, she] would never attract a man." (*Id.* at 69:4–6, 78:8–17, PageID.456, 459.)  Whenever Kowal discussed weddings, engagements, or children being born in the area, Kowal would "constantly" ask McLaughlin "when's your big day?" (*Id.* at 74:8–14, PageID.458.)  Kowal also "asked [McLaughlin] if [she] was into women" and suggested that "[m]aybe that's why [she] wasn't married." (*Id.* at 80:13–14, PageID.459.)   And McLaughlin recounted one day where she "was shown a pillow that [Kowal] gave to another staffer, another woman who did not have kids, and it had a cartoon picture of a woman with her hand on her head with a conversation bubble that said, [']Oops, I forgot to have kids,[']." (*Id.* at 73:23–74:3, PageID.457–458.)  Kowal then "said, [']If they would have had two, I would have given you one as well, Lindsay.[']" (*Id.*)

Kowal also made "[c]onstant" and "derogatory" comments regarding McLaughlin's weight.[2] (*Id.* at 68:3–4, PageID.456.)   For instance, Kowal told McLaughlin that she "wouldn't have back issues if [she] wasn't overweight." (*Id.* at 68:2–3.)  And Kowal told McLaughlin that she wouldn't need accommodations for her back injury if she was not overweight. (*See id.* at 120:11–18, PageID.467.) Kowal's comments regarding McLaughlin's weight were also tied to her inappropriate comments regarding gender, as Kowal frequently suggested that McLaughlin's weight made it hard to "find[] a man" and that McLaughlin's weight meant that she was "into women." (*Id.* at 91:12–16, PageID.462.)

Further, Kowal made several disparaging remarks about McLaughlin's back injuries, time off work, and receipt of worker's compensation benefits.   When McLaughlin was home recovering from her first back surgery, Kowal called McLaughlin and told her "that if [she] didn't return to work, [she] would be [transferred] to the all male DPW [Department of Public Works] and be picking up dead dogs off the side of the road." (*Id.* at 70:1–9, PageID.457.)   Then, when McLaughlin returned to work, Kowal would "pick[] up an empty box in front of the entire office . . . [and say] [']Oh, I'll just claim Workers' Comp. for that and I'll have

_____

[2] McLaughlin estimated that, at the time she was terminated in September 2018, she weighed approximately 255 pounds. (*See* McLaughlin Dep. at 32:12–13, ECF No. 20-1, PageID.450.)

9

a nice long vacation.[']" (*Id.* at 142:24–143:3, PageID.472.) Whenever McLaughlin had to take work off for outpatient procedures or long surgeries, Kowal would refer to this time off as a "vacation." (*See id.* at 143:3–5.) And, when McLaughlin received a cart so that she could move boxes without exceeding her 10-pound lifting limit, Kowal referred to McLaughlin as "lunch lady." (*Id.* at 119:9–14, PageID.467.)[3]

McLaughlin has identified only one other person – Assistant City Manager Grice – who made a disparaging comment regarding her gender. (*See id.* at 81:4–15, PageID.459.) At one point while both McLaughlin and Kowal were employed by the City, Grice held a "peace and harmony" meeting with the all-female clerk's department (which included McLaughlin and Kowal). (*Id.*) The purpose of the meeting was to "work . . . out" "the issues in the department." (*Id.* at 81:11–12.) Grice told the women that "[t]his is what you get sometimes when it's all women in the department." (*Id.* at 81:14–15.) McLaughlin perceived Grice's comment to be

---

[3] Kowal denies making any inappropriate comments with respect to McLaughlin's gender, weight, or back injuries. (*See* Kowal Dep. at 20:4–14, 31:2–25, ECF No. 20-2, PageID.486, 488.) Parpart, however, recalls McLaughlin complaining to her about Kowal pretending to be injured while grabbing an empty box and saying that she would just claim worker's compensation for it. (*See* Pl.'s Parpart Dep. at 59:9–19, ECF No. 20-4, PageID.525.) And Grice recalls Parpart informing him about this incident. (*See* Grice Dep. at 46:22–47:1, ECF No. 20-5, PageID.543–544.)

directed at "all women . . . [t]he three wom[e]n in the department, which [she was] included in." (*Id.* at 81:19–25.)

Aside from Grice's comment regarding the women in McLaughlin's department, McLaughlin could not recall any other comments that were made in the office regarding her gender. (*See id.* at 82:6–9, PageID.460.)  And McLaughlin has not identified any disparaging comments regarding her gender, weight, disabilities, or receipt of worker's compensation benefits that were made in the office after Kowal retired on December 15, 2017.

## D

Kowal's abuse took its toll on McLaughlin.  By June 2018, McLaughlin was diagnosed with chronic Post-Traumatic Stress Disorder ("PTSD"). (*See* 6/25/18 Daftuar and Giles Letter, ECF No. 19-18, PageID.287.)  McLaughlin attributes her PTSD to the abuse that she suffered while working for Auburn Hills. (*See* McLaughlin Dep. at 176:17–23, ECF No. 20-1, PageID.476.)

Around June 21, 2018, McLaughlin took leave off work to treat her PTSD. (*See* McLaughlin Timeline, ECF No. 19-7, PageID.225.)  While out on leave, McLaughlin went to River's Bend P.C. two to three times a week for psychiatric and other treatment for her PTSD. (*See* McLaughlin Dep. at 177:4–19, ECF No. 20-1, PageID.476.)  Per Auburn Hills' leave policy, McLaughlin submitted her medical leave paperwork and documentation informing the City's Human Resources

department that she was disabled and unable to work due to her PTSD. (*See* 6/27/18 and 6/28/18 Email Chain, ECF No. 20-20, PageID.652–654.)  The documentation – a letter from Brittney Daftuar (McLaughlin's social worker at River's Bend) and Dr. Yolanda Giles (McLaughlin's psychiatrist at River's Bend) – informed Auburn Hills that McLaughlin "has been totally disabled and unable to perform any work function starting on 06/25/2018 and will be reevaluated by the psychiatrist on 07/09/2018 for a possible return to work date." (6/25/18 Daftuar and Giles Letter, ECF No. 19-18, PageID.287.)   The City approved her time off work as FMLA leave. (*See* McLaughlin Dep. at 39:7–9, 173:24–25, ECF No. 20-1, PageID.451, 475.)

On July 10, 2018, Auburn Hills HR Generalist Parpart emailed McLaughlin requesting – per the City's FMLA policy – an updated letter from McLaughlin's doctor regarding her status and intention to return to work. (*See* 7/10/18 and 7/11/18 Email Chain, ECF No. 20-21, PageID.656–657.)  On July 12, 2018, Daftuar and Giles sent Auburn Hills a letter informing the City that McLaughlin continued to be disabled by her PTSD and would be reevaluated on July 30, 2018, for a possible return to work. (*See* 7/12/18 Daftuar and McLaughlin Letter, ECF No. 19-22, PageID.343.)  On July 30, 2018, Daftuar and Dr. Giles sent the City another letter saying that McLaughlin continued to be disabled and would be reevaluated on September 17, 2018, for a possible return to work. (*See* 7/30/18 Daftuar and Giles Letter, ECF No. 19-23, PageID.345.)

12

On September 7, 2018, Parpart emailed McLaughlin to inform her that her FMLA leave had been exhausted. (*See* 9/7/18 Parpart Email, ECF No. 19-24, PageID.347.)  The email also informed McLaughlin that she was eligible for unpaid medical leave under the CBA and suggested that she review the relevant portions of the CBA regarding medical leave (*i.e.*, Article 9, Section 3(c) and Article 15, Section 2, *supra*). (*See* 9/7/18 Parpart Email, ECF No. 19-24, PageID.347.)  On September 10, 2018, McLaughlin submitted her official request for medical leave under the CBA. (*See* Medical Leave of Absence Request Form, ECF No. 19-25, PageID.350.) Based on the letter from Daftuar and Dr. Giles, McLaughlin's medical leave was set to expire on September 17, 2018. (*See id.*; 7/30/18 Daftuar and Giles Letter, ECF No. 19-23, PageID.345.)  Thus, under the CBA, McLaughlin was required to either (1) return to work on September 17 or (2) submit medical documentation by the 17th informing the City that she remained disabled (at which point, she could be entitled to continue her unpaid leave). (*See* CBA, Art. 9, § 3(c), Art. 15, § 2(h), ECF No. 19-19, PageID.300, 306.)  And if she did not return to work or submit documentation that she remained disabled within three days of September 17, then McLaughlin would be subject to termination under the CBA. (*See id.*)

**E**

On September 17, 2018, the day that McLaughlin's disability leave was set to expire, she was evaluated at River's Bend by Daftuar and Dr. Giles. (*See* Fax of

Daftuar and Giles Letter, ECF No. 19-29, PageID.362.)  McLaughlin did not return to work that day. (*See* McLaughlin Dep. at 49:1–4, ECF No. 20-1, PageID.452.)  Nor did McLaughlin return to work on September 18 or 19. (*See id.* at 49:5–17.)  Thus, by the end of the day on September 19, 2018, McLaughlin had missed three days of work, and she was subject to termination under the CBA unless she provided the City with medical documentation attesting that she remained disabled. (*See* CBA, Art. 9, § 3(c), Art. 15, § 2(h), ECF No. 19-19, PageID.300, 306.)  But, according to Auburn Hills HR Generalist Parpart, McLaughlin did not submit the required documentation to the City on the 17th, 18th, or 19th. (*See* Def.'s Parpart Dep. at 110:3–13, ECF No. 19-8, PageID.235.)

On September 21, 2018, Parpart attended a meeting with Grice and Auburn Hills City Manager Thomas Tanghe. (*See* Tanghe Dep. at 9:10–10:19, ECF No. 19-9, PageID.240; *see also* Def.'s Parpart Dep. at 10:22–25, ECF No. 19-8, PageID.227.)  At the meeting, Parpart informed Tanghe that McLaughlin's leave had expired on September 17 and that she had not appeared at work nor submitted medical documentation for more than three days. (*See* Def.'s Parpart Dep. at 10:14–21, ECF No. 19-8, PageID.227.)  Parpart told Tanghe that McLaughlin was therefore in violation of the CBA. (*See id.*)  But Parpart did not recommend that McLaughlin

14

be terminated at the time. (*See id.* at 10:9–11.)  Grice also did not say anything during the meeting about whether to terminate McLaughlin.[4] (*See id.* at 11:14–15.)

Based on the information from Parpart, Tanghe decided to terminate McLaughlin's employment. (*See* Tanghe Dep. at 12:24–13:8, ECF No. 19-9, PageID.240–241.)  According to Tanghe, the decision to terminate McLaughlin's employment was "solely" his. (*Id.* at 9:18–19, PageID.240.)  Tanghe denies that considerations regarding McLaughlin's gender, weight, disabilities, or receipt of worker's compensation benefits factored into his decision to fire McLaughlin. (*See id.* at 43:16–44:16, PageID.244.)

The same day that Tanghe decided to end McLaughlin's employment, the City sent McLaughlin a termination letter. (*See* 9/21/18 Termination Letter, ECF No. 19-26, PageID.354.)  The letter explained that the City was discharging McLaughlin pursuant to the CBA because she missed three days of work without providing documentation or notice that she remained disabled:

> On September 10, 2018 you emailed the City a request for continuation of a Medical Leave of Absence.  You stated that the "ending date" of your leave was when you were to see your doctor which was on Monday, September 17, 2018.  It has been four (4) days since your appointment

---

[4] Grice does not recall whether Tanghe asked for his or Parpart's input regarding whether to terminate McLaughlin for violating the CBA. (*See* Grice Dep. at 10:19–11:10, ECF No. 19-10, PageID.247.)  But McLaughlin has not identified any evidence contradicting Parpart's testimony that Grice did not say anything about whether to terminate McLaughlin.

> and the City has heard nothing from you regarding a
> possible return to work date nor has a request been made
> by you to extend your Medical Leave of Absence.

(*Id.*; *see also* CBA Art. 15, § 2(h), ECF No. 19-19, PageID.306.)

## F

McLaughlin says that the City made a mistake.  She insists that she did provide timely notice and documentation to the City that her PTSD rendered her disabled beyond September 17, 2018.  More specifically, McLaughlin says that River's Bend sent Auburn Hills a letter on September 17 informing the City that McLaughlin remained disabled by her PTSD. (*See* McLaughlin Dep. at 49:23–25, ECF No. 19-3, PageID.203.)  McLaughlin further says that she told Parpart about the River's Bend letter shortly after she (McLaughlin) received her termination letter.  McLaughlin says that she emailed Parpart, stating: "A letter with the new date was faxed Monday evening [September 17, 2018] after my doctor appointment. . . . Is the City claiming they did not receive this?" (9/21/18 Email Chain, ECF No. 19-27, PageID.357.)

On September 24, 2018, Parpart responded that, "[t]he City received no fax from your doctor last week or any follow up from you." (9/24/18 and 9/25/18 Email Chain, ECF No. 19-28, PageID.359.)  The next day (September 25th), Parpart asked McLaughlin, "does your doctor's office have confirmation showing they sent a note

on your behalf to the City of Auburn Hills on Monday, September 17, 2018?" (*Id.*) There is no evidence that McLaughlin responded to this email.

Also on September 25, 2018, Parpart received a fax from River's Bend. (*See* Pl.'s Parpart Dep. at 17:1–5, ECF No. 20-4, PageID.517.) The fax included a letter from Daftuar and Dr. Giles – dated September 17, 2018 – informing the City that McLaughlin's PTSD disability was ongoing and that she would be reevaluated for a return to work on December 15, 2018. (*See* Fax of Daftuar and Giles Letter, ECF No. 19-29, PageID.362.)[5] Parpart called River's Bend to ask whether River's Bend sent the letter from Daftuar and Dr. Giles (1) on the day that the letter was dated (*i.e.*, on September 17, 2018) or (2) on September 25. (*See* Pl.'s Parpart Dep. at 17:1–5, ECF No. 20-4, PageID.517.) Parpart spoke with Daftuar "and asked [her] if [River's Bend] had tried to attempt to send [the letter] before." (*Id.*; *see also* Def.'s Parpart Dep. at 108:18–25, ECF No. 19-8, PageID.234.) Daftuar could not confirm to Parpart whether River's Bend had sent the letter on September 17. (*See* Pl.'s Parpart Dep. at 17:3–4, ECF No. 20-4, PageID.517; Def.'s Parpart Dep. at 109:2–11, ECF No. 19-8, PageID.235.) After Parpart spoke with Daftuar, she received a call from Bruce Goldberg, the director of River's Bend. (*See* Def.'s Parpart Dep. at 109:18–

---

[5] McLaughlin has since submitted an affidavit from Daftuar attesting that the letter from Daftuar and Dr. Giles was faxed to the City of Auburn Hills on September 17, 2018. (*See* Daftuar Aff. & Letter, ECF No. 20-22, PageID.659–661.)

22, ECF No. 19-8, PageID.235.)  According to Parpart's notes from the phone call, Goldberg explained why River's Bend had not sent the letter concerning McLaughlin to the City on September 17.  Goldberg "indicated his office was not aware that they were to notify our office as well as the short term disability carrier of the additional time off needed by [McLaughlin]." (Parpart Notes, ECF No. 19-30, PageID.364.)

After Parpart's communications with Daftuar and Goldberg, Auburn Hills sent McLaughlin another letter reaffirming its decision to terminate McLaughlin. (*See* 9/27/18 Termination Letter, ECF No. 19-31.)  The letter included a summary of Parpart's investigation into whether River's Bend sent the City a letter on September 17, 2018. (*See id.*, PageID.367.)   And the letter concluded that McLaughlin "failed to comply with [Article 9, Section 3(c) of the CBA, and] therefore our decision to terminate your employment stands." (*Id.*, PageID.368.)

## II

On January 7, 2019, McLaughlin filed this action against Auburn Hills in the Wayne County Circuit Court. (*See* Compl., ECF No. 1-1.)  Auburn Hills removed the case to this Court on January 28, 2019. (*See* Notice of Removal, ECF No. 1.)

McLaughlin brings discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, the Michigan Elliott-Larsen Civil Rights

Act (the "ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.*, the Michigan Persons with Disabilities Rights Act (the "PWDCRA"), Mich. Comp. Laws § 37.1101 *et seq.*, and the Michigan Worker's Disability Compensation Act (the "WDCA"), Mich. Comp. Laws § 418.301(1). (*See* Compl. ¶¶ 30–43, ECF No. 1-1, PageID.12–13.) McLaughlin's discrimination claims rest upon her allegations that Auburn Hills terminated her employment on the basis of her gender, weight, and disabilities, and because she exercised her right to receive worker's compensation benefits. (*See id.*) She also alleges that the City denied her reasonable accommodations for her disabilities. (*See id.*, PageID.12.)  Notably, even though McLaughlin alleges that Kowal subjected her to substantial abuse, McLaughlin does not bring a claim for a hostile work environment.

Auburn Hills moved for summary judgment on all of McLaughlin's claims on February 13, 2020. (*See* Mot. for Summ. J., ECF No. 19.)  McLaughlin responded (*see* Resp., ECF No. 20), and the Court held an on-the-record video hearing on Auburn Hills' motion on July 8, 2020.

### III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-

moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

### IV

### A

The Court begins with McLaughlin's discrimination claims. A plaintiff bringing discrimination claims under the statutes invoked by McLaughlin may survive summary judgment by presenting sufficient direct evidence of discrimination or by presenting sufficient indirect evidence of discrimination under the familiar *McDonnell Douglas* burden-shifting framework.[6] McLaughlin has not

---

[6] *See, e.g.*, *Robinson v. MGM Grand Detroit, LLC*, --- F. App'x ---, 2020 WL 4283961 (6th Cir. July 27, 2020) ("We analyze all of Robinson's retaliation claims using the same framework. When a plaintiff presents circumstantial evidence of . . . retaliation in violation of the ADA or PWDCRA, or retaliation in violation of Title VII and ELCRA, we apply the *McDonnell Douglas* . . . burden shifting framework."); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606

presented direct evidence that she was terminated on the basis of her gender, weight, disabilities, or receipt of worker's compensation benefits.  Accordingly, the Court analyzes McLaughlin's claims under the *McDonnell Douglas* framework.

Under that framework, "the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019).  Second, "[i]f the plaintiff establishes a prima facie case of . . . discrimination, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).  Third, "[i]f the defendant provides a legitimate, non-discriminatory reason, the plaintiff must then produce evidence that the defendant's proffered reason is a pretext for discrimination." *Id.*

Auburn Hills argues that McLaughlin has not established a *prima facie* case of discrimination on any of her claims. (*See* Mot. for Summ. J., ECF No. 19, PageID.167–184.)   In the alternative, the City argues that it has provided a

---

(6th Cir. 2019) (applying the *McDonnell Douglas* framework to plaintiff's Title VII and ELCRA claims); *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (applying the *McDonnell Douglas* framework to plaintiff's ADA and PWDCRA claims); *Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519, 525–26 (Mich. Ct. App. 2012) (applying the *McDonnell Douglas* framework to plaintiff's WDCA claims); *Taylor v. Gen. Motors, LLC*, No. 15-cv-10529, 2016 WL 1223358, at *8–9 (E.D. Mich. Mar. 29, 2016) (applying the *McDonnell Douglas* framework to plaintiff's WDCA claims).

legitimate, non-discriminatory reason for its actions, and that McLaughlin has not produced evidence that the City's proffered reason is pretextual. (*See id.*)  For the reasons set forth below, the Court agrees with the City on both points.

## B

The Court begins with McLaughlin's claim that the City terminated her employment on the basis of her gender in violation of Title VII and the ELCRA. (*See* Compl. ¶ 34, ECF No. 1-1, PageID.11.)  Under Title VII, an employer may not "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).  Likewise, under the ELCRA, an employer may not "discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex." Mich. Comp. Laws § 37.2202(1)(a).

While the legal standards governing gender discrimination claims under Title VII and the ELCRA are generally the same, *see Humenny*, 390 F.3d at 906, the City cites different versions of the *prima facie* case that a plaintiff must satisfy under the respective statutes.  With respect to Title VII, the City directs the Court to the Sixth Circuit's decision in *Humenny*, *supra*, in which the court said: "To make out a prima facie case for gender discrimination [under Title VII], a plaintiff must show that she was (1) a member of the protected class, (2) subject to an adverse employment

22

action, (3) qualified for the job, and (4) treated differently than similarly situated male employees for the same or similar conduct." *Id.*  With respect to the ELCRA, the City directs the Court to the decision of the Michigan Supreme Court in *Lytle v. Malady*, in which that court said: "To establish a prima facie case of discrimination [under the ELCRA], plaintiff must prove by a preponderance of the evidence that (1) she was a member of the protected class; (2) she suffered an adverse employment action . . . [;] (3) she was qualified for the position; but (4) she was discharged under circumstances that give rise to an inference of unlawful discrimination." 579 N.W.2d 906, 914 (Mich. 1998).  McLaughlin does not take issue with the versions of the *prima facie* case cited by the City nor does she offer a competing *prima facie* case for the Court to apply. (*See* Resp. at 35 n.25, ECF No. 20, PageID.35.)  Instead, she argues that she has satisfied her *prima facie* case under the standard set forth by the City. (*See id.*, PageID.35–36.)  The Court disagrees.

First, McLaughlin has failed to satisfy her *prima facie* case of gender discrimination under Title VII because she has not identified a similarly situated City employee who was treated differently than her for the same or similar conduct.

Second, McLaughlin has not satisfied her *prima facie* case of gender discrimination under the ELCRA because she has not presented sufficient evidence that she was discharged under circumstances that give rise to an inference of unlawful discrimination.  McLaughlin argues that Kowal's "constant bar[r]age of

comments related to her gender . . . . must be considered as one of the explanations for Defendant's retaliation against [her]." (Resp., ECF No. 20, PageID.443–444.) But Kowal's animus toward McLaughlin is not evidence that McLaughlin was fired for a discriminatory reason. Indeed, there is no evidence that Kowal played any role in McLaughlin's termination. Instead, the undisputed evidence shows that Tanghe alone made the decision to fire McLaughlin and that he did so without any input from Kowal (whose employment with the City ended nine months before McLaughlin was fired). Thus, evidence of Kowal's alleged misconduct does not support an inference that the City fired McLaughlin for discriminatory reasons.[7]

Nor has McLaughlin identified sufficient evidence that Tanghe fired her for unlawful reasons. In fact, McLaughlin has not pointed to any evidence that Tanghe harbored gender-based animus toward her or that he considered her gender in any way when he decided to fire her. On this record, McLaughlin has failed to satisfy her *prima facie* case of gender discrimination under Title VII or the ELCRA, and for

---

[7] In McLaughlin's brief, she does not mention or develop an argument under the "cat's paw" theory of discrimination. "In a cat's paw case, the plaintiff seeks 'to hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). McLaughlin's counsel raised this theory of liability at oral argument. But the cat's paw theory does not support McLaughlin's case because it was Parpart who brought McLaughlin's alleged CBA violation to Tanghe's attention, and McLaughlin has not identified any evidence that Parpart harbored discriminatory animus of any kind toward McLaughlin.

that reason, the City is entitled to summary judgment on those claims. *See, e.g.*, *Fuhr v. Sch. Dist. of City of Hazel Park*, 837 F. Supp. 2d 675, 681 (E.D. Mich. 2011), *aff'd sub nom. Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668 (6th Cir. 2013) ("[P]laintiff's gender discrimination . . . claims [under Title VII and ELCRA fail] because plaintiff has produced no evidence—either direct or circumstantial—suggesting that her gender had anything whatsoever to do with defendant's decision to remove her as the girls' varsity basketball coach or with any of the harassment she allegedly suffered."); *see also Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1283 (11th Cir. 2003) ("In short, the undisputed facts conclusively demonstrate that Walton was discharged because she failed to return to work [from disability leave] and that her gender played no motivating role in Ortho's decision.").[8]

## C

The Court next addresses McLaughlin's weight discrimination claim under the ELCRA.  That statute prohibits discrimination "because of . . . weight." Mich.

––––––––––––––––

[8] At McLaughlin's deposition, she identified Grice's comment that "[t]his is what you get sometimes when it's all women in the department" as further evidence of gender-related animus that the City directed toward her. (McLaughlin Dep. at 81:14–15, PageID.459.)  To the extent that a reasonable jury could find that this is evidence of gender-related animus directed toward McLaughlin, it still does not help McLaughlin meet her *prima facie* case of gender discrimination because she has not identified any evidence that Grice participated in the decision to terminate her employment.  Indeed, the undisputed evidence in the record reflects that Grice did not say anything at the meeting where Tanghe decided to terminate McLaughlin. (*See* Parpart Dep. at 11:14–15, ECF No. 19-8, PageID.227.)

Comp. Laws § 37.2202(1)(a).  "To prove a *prima facie* case of weight discrimination under the ELCRA, Plaintiff must prove that: (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her termination gives rise to an inference of unlawful discrimination." *Harrison v. Soave Enters.*, No. 16-14084, 2019 WL 296699, at *4 (E.D. Mich. Jan. 23, 2019) (citing *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003)).

McLaughlin has failed to establish a *prima facie* case of weight discrimination for the same reason that she failed to make a *prima facie* case of gender discrimination.  She simply has not identified any evidence that Tanghe considered her weight in any way when he decided to fire her.  Thus, her weight discrimination claim under the ELCRA fails as a matter of law.

### D

The Court turns next to McLaughlin's disability discrimination claims. McLaughlin alleges that she was terminated on the basis of her disabilities in violation of the federal ADA and the Michigan PWDCRA. (*See* Compl. ¶ 39, ECF No. 1-1, PageID.12.)  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  The PWDCRA similarly provides that an

26

employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202(1)(b). "To state a prima facie case of disability discrimination [under the ADA and the PWDCRA], a plaintiff must show that (1) [s]he is disabled or his employer regarded him as disabled, (2) [s]he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) [s]he suffered an adverse employment action because of [her] disability." *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019).

McLaughlin's ADA and PWDCRA claims fail for the same reason her other discrimination claims fail: she has not provided sufficient evidence for a jury to infer that she was terminated because of her disabilities. Although McLaughlin has presented evidence of Kowal's animus toward her arising out of her disabilities, McLaughlin has not demonstrated that Kowal's animus tainted Tanghe's decision-making process. Nor has she presented sufficient evidence that Tanghe considered her disabilities in any way when he decided to fire her. Accordingly, McLaughlin has not established a *prima facie* case that she was terminated because of her disabilities. Auburn Hills therefore is entitled to summary judgment on her ADA and PWDCRA claims.

## E

Finally, the Court turns to McLaughlin's allegation that she was terminated for exercising her right to receive worker's compensation benefits. (*See* Compl. ¶ 43, ECF No. 1-1, PageID.12.)  Under the WDCA, "[a] person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under [the Worker's Disability Compensation Act] or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act." Mich. Comp. Laws § 418.301(13).  "To establish a prima facie case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected." *Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519, 525–26 (Mich. Ct. App. 2012).

As with her discrimination claims, McLaughlin has not presented a *prima facie* case of WDCA retaliation because she has not presented sufficient evidence that she was terminated because she exercised her right to receive worker's

compensation. McLaughlin argues that "Kowal's repeated derogatory remarks about Plaintiff's work related injuries and [Kowal's] treatment" of McLaughlin demonstrate that she was terminated because she exercised her WDCA rights. (Resp., ECF No. 20, PageID.439–440.) But, as explained above, Kowal's animus toward McLaughlin does not show that Tanghe decided – nine months after Kowal retired – to terminate McLaughlin because she exercised her right to receive worker's compensation benefits. McLaughlin further contends that she has established a causal link between her protected status and her termination because "Defendant's September 21, 2018 and September 27, 2018 termination letters to Plaintiff specifi[c]ally link Plaintiff's termination to her receipt of continued medical treatment, thereby creating an inference of causation." (*Id.*, PageID.438.) But McLaughlin does not fairly characterize the letters. The letters simply explain that McLaughlin was terminated because she did not return to work or provide documentation that she remained disabled by her PTSD. That explanation for McLaughlin's termination does not support a reasonable inference that the City fired her based upon her receipt of workers compensation benefits. Accordingly, McLaughlin has not presented a *prima facie* case that she was terminated because she exercised her right to receive worker's compensation benefits. Auburn Hills is therefore entitled to summary judgment on her WDCA claim.

**F**

In the alternative, even if McLaughlin had established a *prima facie* case on any of her discrimination claims, the City would still be entitled to summary judgment on all of those claims because McLaughlin has failed to show that the City's reason for firing her – because she did not return to work or submit documentation that she remained disabled during the three days after her leave expired – was a pretext for discrimination.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin*, 821 F.3d at 612 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Here, McLaughlin argues that the City's reason for terminating her had no basis in fact. She says that, contrary to the City's reason, she *did* provide the City with timely documentation that she remained disabled by her PTSD. More specifically, she directs the Court to evidence that on September 17, 2018, River's Bend sent the City a letter informing it that McLaughlin remained disabled. (*See, e.g.*, Daftuar Aff. & Letter, ECF No. 20-22, PageID.659–661.) Thus, she insists that the City was mistaken when it concluded that she failed to submit timely documentation of her continuing disability.

But even if McLaughlin could show that the City's conclusion was wrong as a matter of fact, that would not be enough to establish pretext if the City had an "honest belief" that she failed to submit such documentation. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir. 2012). Under the so-called "honest-belief rule":

> "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713–15 (6th Cir.2007)).
>
> The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process. We have noted that the "key inquiry ... is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir.2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998)). The employer certainly must point to particularized facts upon which it reasonably relied. But "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir.2008).
>
> To defeat a summary judgment motion in such circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants ... did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir.2001) (internal citations, quotation marks, and

> brackets omitted) (alteration in original). For example, the plaintiff may produce evidence that an error by the employer was "too obvious to be unintentional." *Smith*, 155 F.3d at 807 (citation omitted). However, "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir.2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 Fed.Appx. 783, 791 (6th Cir.2006)).

*Id.* at 531.

Here, the City has presented evidence that Parpart honestly believed that McLaughlin failed to submit documentation of her continuing disability, that she reported that belief to Tanghe, and that when Tanghe decided to fire McLaughlin, he honestly believed that she had failed to submit the required documentation. McLaughlin has not presented any evidence that Parpart or Tanghe did not honestly believe that she had failed to submit documentation of her continuing disability.

Nor has McLaughlin presented sufficient evidence that the City refused to conduct an appropriate investigation into the basis for her termination. As described above, when McLaughlin told Parpart that River's Bend had sent a letter regarding her continuing PTSD disability on September 17, 2018, Parpart conducted further inquiry. She first spoke to Daftuar and learned that Daftuar could not confirm that River's Bend sent the letter on the 17th. She then spoke to Goldberg and learned River's Bend's explanation for failing to send the letter on the 17th. Parpart also

32

emailed McLaughlin to inquire whether she had any proof that River's Bend submitted a letter on the 17th, and there is no evidence suggesting that McLaughlin responded to this email. (*See* 9/24/18 and 9/25/18 Email Chain, ECF No. 19-28, PageID.359.)  Under these circumstances, the City "made a reasonably informed and considered decision" when it reaffirmed its dismissal of McLaughlin by letter dated September 27, 2018.  Because the City honestly believed that McLaughlin violated the CBA by failing to return to work or submit documentation of her continuing disability within three days after her leave expired, she cannot establish that the City's proffered reason for her dismissal was pretextual.

Thus, for this additional reason, Auburn Hills is entitled to summary judgment on McLaughlin's federal and state discrimination claims.

## V

The Court next turns to McLaughlin's claim that Auburn Hills violated the ADA when it denied her reasonable accommodations for her disabilities. (*See* Compl. ¶ 39, ECF No. 1-1, PageID.12.)  The ADA requires employers to make "reasonable accommodations" to an employee's disabilities. 42 U.S.C. § 121129(b)(5)(A).  McLaughlin says that her disabilities are "Chronic Failed Back Syndrome/Post Laminectomy Syndrome and Chronic Post Traumatic Stress Disorder." (Compl. ¶ 38, ECF No. 1-1, PageID.12.)  McLaughlin identifies two reasonable accommodations that she says Auburn Hills denied her (1) Dr. Ahlgren's

"weight lifting restrictions," and (2) "a leave of absence for treatment of her work-related PTSD." (*See* Resp., ECF No. 20, PageID.441.)

Auburn Hills moves for summary judgment on McLaughlin's reasonable accommodations claim. (*See* Mot. for Summ. J., ECF No. 19, PageID.176–182.) The Court addresses each accommodation in turn.

## A

Auburn Hills argues that it did not deny McLaughlin the reasonable accommodation of a 10-pound lifting restriction because she did not request such an accommodation and, in the alternative, that such an accommodation was not necessary for her to perform her work. (*See id.*, PageID.178–179.)

The Court disagrees. McLaughlin has presented evidence that she did request a 10-pound lifting limit. (*See, e.g.*, McLaughlin Dep. at 117:1–118:25, ECF No. 20-1, PageID.466–467.) And the Court is not yet convinced that this restriction was not necessary. Accordingly, Auburn Hills is not entitled to summary judgment on McLaughlin's claim that the City denied her the reasonable accommodation of a 10-pound lifting limit.

## B

Auburn Hills also argues that it did not deny McLaughlin the reasonable accommodation of a leave of absence for her PTSD. (*See* Reply, ECF No. 21, PageID.671–673.) Auburn Hills says that McLaughlin never requested this

accommodation.  In support of this argument, Auburn Hills cites to the following colloquy from McLaughlin's deposition:

> Q: Okay. So you requested three accommodations, 10 pound weight limit, no repetitive bending, lifting or twisting, and you wanted a handicap – park in a handicap parking spot, right?
>
> A: Correct.
>
> Q: Any other accommodations you requested?
>
> A: That was what my back surgeon requested, so no.

(McLaughlin Dep. at 116:5–11, ECF No. 20-1, PageID.466; *see also* Reply, ECF No. 21, PageID.671–673.)  Auburn Hills says that McLaughlin is bound by this testimony and that she may not now contend that she requested a leave of absence as an accommodation.  The Court agrees.

In any event, even if McLaughlin had formally requested leave from work as a reasonable accommodation, the City would still be entitled to summary judgment on her claim that it failed to accommodate her by granting that request.  As explained above, the City lawfully terminated her employment just as the requested leave would have begun.  Having lawfully fired McLaughlin, the City had no legal obligation to grant her any accommodations – much less an accommodation of additional leave.  Thus, the City is entitled to summary judgment on McLaughlin's claim that it failed to grant her request for the reasonable accommodation of additional leave to address her PTSD.

35

## VI

Accordingly, for the reasons explained above, Auburn Hill's Motion for Summary Judgment (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Auburn Hills is **GRANTED** summary judgment with respect to McLaughlin's claims that she was unlawfully discriminated against with respect to her gender, weight, disability, and because she exercised her right to receive worker's compensation benefits;

- Auburn Hills is also **GRANTED** summary judgment with respect to McLaughlin's claim that she was denied a reasonable accommodation regarding her request for leave to treat her PTSD; and

- Auburn Hills is **DENIED** summary judgment with respect to McLaughlin's claim that she was denied a reasonable accommodation regarding her 10-pound lifting limit. McLaughlin's action shall proceed on this claim only.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: August 6, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 6, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764